THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| The Millard Group Inc., and <br> Millard Metal Maintenance Co. LLC, <br>   dba The Millard Group, LLC of Illinois, <br><br>             Plaintiffs, <br> v. <br><br> James B. Stutesman, <br> Tom Frye, and <br> Harvard Maintenance, Inc., <br><br>             Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiffs, The Millard Group Inc. ("Millard Group") and Millard Metal Maintenance Co. LLC, dba The Millard Group, LLC of Illinois ("Millard Metal") (collectively, "Millard") bring this Complaint for injunctive and other relief against two former employees, Defendant James B. Stutesman ("Stutesman") and Defendant Tom Frye ("Frye"), and also their current or imminent employer, Defendant Harvard Maintenance, Inc. ("Harvard"). In support of its Complaint, Millard states as follows:

## INTRODUCTION

1. Millard is a 102-year-old, family-owned business that operates in the highly competitive maintenance and janitorial service industry. Millard provides maintenance services to commercial buildings in downtown Chicago, the suburbs, and surrounding states, as well as to malls in approximately 30 states. Millard's customers are the owners and/or managers of these buildings.

2. Defendant Stutesman joined Millard in October 1998, and until July 26, 2017, was one of Millard's most senior executives. Stutesman was a Senior Vice President with responsibility for Millard's entire Commercial Division, which provides services to office

buildings and other commercial and industrial properties and represents approximately one-half of Millard's business. Prior to his departure from Millard, Stutesman was responsible for supervising in excess of 1400 Millard employees. He was also a member of Millard's Executive Leadership Team, which gave him access to confidential Millard information even beyond what was needed to run Millard's Commercial Division.

3. In May 2017 Defendant Stutesman knowingly and with the intent to defraud Millard accessed a Millard "protected computer" (as that term is defined in the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(e)(2)), and stole Millard's key spreadsheet data. Exhibit 1 to this Complaint, which is incorporated in its entirety, and which was not known to Millard until fairly recently, is a copy of the email in which Defendant Stutesman sent Millard's protected information to his home email address. A listing of each highly confidential, highly sensitive, highly-valuable spreadsheet that Stutesman sent to himself in furtherance of his scheme (the "May 26 Stolen Information") is set forth in Exhibit 2. By such conduct Defendant Stutesman obtained something of value in furtherance of his intended fraud and caused Millard an unknown amount of losses, but which is in excess of the statutory requirement of $5,000.

4. Millard has also only recently learned the following additional information. Defendant Harvard has employed Defendant Stutesman as either an employee or third-party consultant to provide Defendant Harvard certain services. Through such employment of Stutesman, Harvard benefits from Stutesman's theft of the May 26 Stolen Information. In addition, any such services that Stutesman provided to Harvard would be in violation of his October 26, 1998 non-compete agreement with Millard Metal (hereafter, the "Stutesman contract") because his services would involve the same territory and customers that Stutesman served while employed at Millard, which he is prohibited from soliciting until at least July 2019

under the Stutesman contract. A copy of the Stutesman contract is attached to and incorporated into this Complaint as Exhibit 3.

5. Defendant Harvard has also contracted with Defendant Frye, who gave his notice to Millard on Friday, November 17, and who has indicated to Millard that he also will be employed by Defendant Harvard beginning on or about December 1, 2017. On information and belief, the services Harvard has retained Frye to provide would violate Frye's May 20, 2015 confidentiality and non-solicitation agreement with Millard (hereafter, the "Frye contract"), because the services would involve the same territory and customers that Mr. Frye served while employed at Millard, which he is prohibited from soliciting until November 2019 under the Frye contract. A copy of the Frye contract is attached to and incorporated into this Complaint as Exhibit 4.

## THE PARTIES

6. Plaintiff The Millard Group Inc. ("Millard") is an Illinois corporation with its principal place of business in Lincolnwood, Illinois.

7. Plaintiff The Millard Metal Maintenance Co, LLC ("Millard Metal"), dba The Millard Group LLC of Illinois, is a Delaware corporation with its principal place of business in Lincolnwood, Illinois. Millard Metal's sole member is Millard Group, and Millard Metal is a wholly-owned subsidiary of Millard Group.

8. Defendant Stutesman is a former Senior Vice President of Millard, a current employee or third-party consultant to Harvard, and is domiciled at 1512 E. Bailey Rd., Naperville, IL 60565.

9. Defendant Frye is a former employee of Millard, a contracted employee to Harvard, whose employment is scheduled to begin on or about December 1, 2017, and he is domiciled at 1S000 East Mallory Drive, Geneva, IL 60134

10. Defendant Harvard is a New York corporation with its principal place of business in Miami, Florida ("Harvard"). This Court has personal jurisdiction over Defendant Harvard because it maintains substantial offices in both Chicago, Illinois, and Elk Grove Village, Illinois, both of which are within this judicial district, and because it conducts significant janitorial and maintenance services in Illinois and this judicial district.

## JURISDICTION AND VENUE

11. The Court has federal jurisdiction over Count I of this Complaint pursuant to 28 U.S.C. § 1331 (the general federal jurisdiction statute); 18 U.S.C. §§ 1030(a)(2)(C) and (a)(4) (substantive provisions of the CFAA); and 18 U.S.C. § 1030(g) (the private-right-of-action provision of the CFAA).

12. The Court also has supplemental jurisdiction over several additional common law counts and over defendants Frye and Harvard under Illinois law pursuant to 28 U.S.C. § 1367(a). These state common law claims do not raise novel or complex issues of state law nor do they predominate over Plaintiff's federal claim in Count I.

13. Venue is proper in this district under 18 U.S.C. § 1391(b)(1) because all three defendants reside in this judicial district (as that term is defined in 18 U.S.C. § 1391(c)(1) & (c)(2)) and also under 18 U.S.C. § 1391(b)(2) because both a substantial part of the events giving rise to the claim occurred in this judicial district and a substantial part of property that is the subject of this action is situated in this judicial district.

4

## **KEY BACKGROUND FACTS**

### A.  James B. Stutesman and Harvard Maintenance

14.  On October 26, 1998, Stutesman entered into the Stutesman contract, a binding non-compete agreement with Millard Metal. Millard Group is the sole member of Millard Metal and as such, Millard Group, in addition to Millard Metal, has the legal authority to enforce the binding Stutesman contract.

15.  The Stutesman contract provided in pertinent part as follows:

(a)  Paragraph 5 required Stutesman, upon leaving Millard's employ, to return all "materials, papers, books, files, documents, programs, and all other information" in his possession, custody, or control that related to: (i) Millard; (ii) Millard's customers; or (iii) Millard's business practices (collectively, the "Millard Property");

(b)  Paragraph 5 prohibited Stutesman, upon leaving Millard's employ, from retaining or taking any Millard Property.

(c)  Paragraph 4 prohibited Stutesman from disclosing to any other of Millard's competitors or potential competitors any of the following information, all of which Stutesman has contractually agreed was Millard's confidential and proprietary information: (i) Millard's business information; (ii) Millard's financial information; (iii) the identity of Millard's customers; (iv) the identity of Millard's customers' employees who are "responsible for placing and maintaining" an account with Millard; (v) Millard's suppliers; (vi) Millard's accounts; and (vii) the types of services that Millard provides to customers. All of the confidential and proprietary information identified in this sub-paragraph shall hereafter be referred to collectively as "Millard's Confidential and Proprietary Information."

(d)  Paragraph 6 barred Stutesman for two years (July 26, 2017 until July 26, 2019) from directly or indirectly soliciting, diverting, taking away, or attempting to solicit,

5

divert, or take away, or assisting any other person or company to do so, any Millard customer who was a Millard customer at any time after July 26, 2016 (hereafter, "Millard Customer").

(e) Paragraph 6 barred Stutesman for two years (July 26, 2017 until July 26, 2019) from directly or indirectly soliciting, diverting, taking away, or attempting to solicit, divert, or take away, or assisting any other person or company to do so, any Millard employee.

(f) Paragraph 6 barred Stutesman for two years (July 26, 2017 until July 26, 2019) from causing, or assisting any other person to cause, any Millard Customer (as defined above) from refraining to contract or from refraining from continuing to contract with Millard.

16. Millard has a near-permanent relationship with its customers, as that term is defined in Illinois case law. During the almost 19 years that Millard employed Stutesman, Millard introduced Stutesman to all (or virtually all) of its customers and provided Stutesman with many opportunities to interact with its customers. Virtually all of the relationships that Stutesman has developed in the maintenance industry he has developed while employed at Millard. But for his employment with Millard and his signing of the Stutesman contract, Stutesman would not have met Millard's customers.

17. On May 26, 2017, Stutesman stole highly confidential, highly proprietary, highly sensitive information by removing such information from Millard's *protected computer* (as that term is defined in 18 U.S.C. § 1030(e)(2)) by intentionally forwarding such information from that computer to his own personal Yahoo address. This act exceeded Stutesman's *authorized access* to the May 26 Stolen Information (as that term is defined in 18 U.S.C. § 1030(e)(6)). *See* Exhibits 1 and 2.

18. The May 26 Stolen Information that Stutesman forwarded to his personal email address was some of Millard's most confidential and competitively sensitive information. It

included the margins that Millard made at each customer identified in the data; the number of employees that Millard sent to each customer identified in the data; salary information for Millard employees; and other significant financial and operational information and data related to Millard's service to its customers. In short, the information Stutesman stole would provide any competitor with Millard's "playbook" and allow any competitor to gain an immediate and unfair competitive advantage.

19. Significantly, Stutesman's theft of the May 26 Stolen Information occurred a few hours after Millard learned that it would be losing a significant account for which Stutesman had primary responsibility. Indeed, Stutesman sent himself the May 26 Stolen Information within approximately one-half hour of the Millard CEO writing to the lost customer seeking one final opportunity to retain the business.

20. On July 26, 2017, Stutesman left Millard and specifically informed Millard that he intended to leave the maintenance industry altogether. (Stutesman's theft of the May 26 Stolen Information was not known to Millard at that time.) On Wednesday, November 15, 2017, Defendant Frye informed Millard Senior Vice President of Sales and Marketing Dave Schupmann that although the "official word" was that Stutesman was out of the maintenance industry, Frye suggested that Stutesman was in fact providing services in some capacity to Harvard, either as an employee or a third-party consultant.

**B. Thomas Frye and Harvard Maintenance**

21. On or about May 20, 2015, Frye entered into the Frye contract, a binding confidentiality and non-solicitation agreement with Millard Group. As of November 17, 2017, Frye had been a Millard employee for approximately 2-1/2 years. As of November 17, 2017, Frye

7

was a senior salesman and reported directly to SVP Dave Schupmann. Under the Frye contract, Frye had the following contractual duties to Millard:

    (a)    Paragraph 3b required Frye to protect the secrecy and confidentiality of all Millard "Trade Secrets" and also "Confidential Information," as that term is defined in the binding Frye contract.

    (b)    Paragraph 3b required Frye, upon his departure from the company, to return any originals, copies, or compilations (computer or otherwise) of any Millard Confidential Information or Trade Secrets in his possession, custody, or control.

    (c)    Paragraph 3c barred Frye from disclosing to any of Millard's competitors or potential competitors any Millard Confidential Information or Trade Secrets.

    (d)    Paragraph 4a prohibited Frye until November 20, 2019, from directly or indirectly selling products to, providing services to, soliciting business from, communicating with, or otherwise have contact with, any Millard customer (which is defined as any person, corporation, or other entity with whom Frye had contact, for whom Frye performed work, or about which Frye accessed any Millard Confidential Information from November 20, 2015 to the present) or any prospective Millard customer (which is defined as any person, corporation, or other entity who was not a Millard customer but with whom Frye had contact as a result of his employment with Millard, or to whom Frye submitted a presentation or proposal, or to whom Frye assisted other Millard employees in submitting a presentation or proposal, or about which Frye accessed any Confidential Information or Trade Secrets).

    (e)    Paragraph 4a prohibited Frye, for two years from his departure from Millard, from directly or indirectly soliciting, diverting, taking away or attempting to solicit,

divert, or take away, or assisting any other person or company to do so, any Millard employee, without the prior express written consent of Millard's President.

21. On Friday, November 17, 2017, Frye informed Millard SVP Schupmann that he was leaving Millard and was joining Harvard as an employee in its suburban office (which is located in Elk Grove Village).

22. On Monday, November 20, 2017, Frye departed Millard, subject to all of the terms of the Frye contract.

23. In the two months prior to Frye's departure, Millard has noticed a marked decline in Frye's performance, particularly where Millard is bidding on work currently done by Harvard. By way of example, on November 7, 2017, Frye gave a presentation to a prospective client that was also attended by Millard's Senior Vice President Schupmann. Frye's performance during that presentation was his worst ever. The incumbent provider to this particular customer is Harvard, Frye's imminent employer.

24. Closer to November 17, 2017, Frye informed Schupmann that a different commercial cleaning contract Schupmann understood Millard to have won had in fact been lost. Frye did not disclose the winning bidder to Schupmann, but Millard is aware that Harvard was the incumbent service provider to that particular customer.

## COUNT I
## VIOLATION OF THE CFAA BY DEFENDANT STUTESMAN

25. Plaintiff re-alleges paragraphs 1-24 as paragraph 25 of Count I.

26. The Computer Fraud and Abuse Act ("CFAA") makes illegal acts that exceed authorized access to a protected computer. It imposes both civil and criminal liability. An individual violates the CFAA if he "intentionally accesses a computer without authorization or

exceeds authorized access and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1930.

27. On May 26, 2017, Stutesman intentionally gained access to a Millard protected computer, as that term is defined in the CFAA.

28. Stutesman gained access to and removed information from the protected computer in excess of his authorization to do so, all in violation of the CFAA.

29. By Stutesman's action, Millard suffered a loss as that term is defined in the CFAA.

30. By Stutesman's action, Millard suffered a loss in excess of $5,000 in one calendar year.

## COUNT II
## COMMON LAW CONVERSION BY DEFENDANT STUTESMAN

31. Plaintiff re-alleges paragraphs 1-30 as paragraph 31 of Count II.

32. Defendant Stutesman assumed control and dominion over the property he converted.

33. Millard has a right to the property that Stutesman converted.

34. Millard has an absolute and unconditional right to the return of the property that Stutesman converted.

35. Millard has made contemporaneous demand on Stutesman for return of the property.

36. Millard suffered harm as a result of Stutesman's wrongful conversion.

37. Stutesman's action was a direct and proximate cause of the harm that Millard has suffered from Stutesman's conversion.

## COUNT III
## BREACH OF CONTRACT BY DEFENDANT STUTESMAN

38. Plaintiff re-alleges paragraphs 1-37 as paragraph 38 of Count III.

39. The terms set forth in Stutesman's contract are necessary to protect Millard's legitimate and protectable business interest.

40. Millard's legitimate protectable business interest in enforcing the Stutesman contract is established by Stutesman's acquisition of confidential Millard information through his Millard employment, which he is attempting – through theft, conversion, and his CFAA violation – to use for his own gain.

41. Millard's legitimate protectable business interest in enforcing the Stutesman contract is established by (a) the nature of the plaintiff's business; (b) the fact that Millard's relationships with its customers are near permanent; and (c) the fact that Stutesman would not have had contact with these customers absent Stutesman's employment with Millard over the last approximately 19 years.

42. The terms of Stutesman's covenants not to solicit customers and employees are reasonable as to time, territory, and restricted activity.

43. Stutesman's solicitation of Millard customers will cause Millard irreparable injury.

44. Stutesman's solicitation of Millard employees will cause Millard irreparable injury.

45. Millard has made contemporaneous demand on Stutesman to not solicit Millard's customers or employees and to not assist any Millard competitor in doing so.

46. Millard has no adequate remedy at law if Stutesman were to breach the Stutesman contract.

11

47. Millard is likely to succeed on the merits of his breach of contract claim against Stutesman.

## COUNT IV
## BREACH OF CONTRACT BY DEFENDANT FRYE

48. Plaintiff re-alleges paragraphs 1-47 as paragraph 48 of Count IV.

49. The terms set forth in Frye's contract are necessary to protect Millard's legitimate and protectable business interest.

50. Millard's legitimate protectable business interest in enforcing the Frye contract is established by Frye's acquisition of confidential Millard information through his Millard employment, which he is attempting to use for his own gain.

51. Millard's legitimate protectable business interest in enforcing the Frye contract is established by (a) the nature of the plaintiff's business; (b) the fact that Millard's relationships with its customers are near permanent; and (c) the fact that Frye would not have had contact with these customers absent Frye's employment with Millard over the last approximately 2-1/2 years.

52. The terms of Frye's covenants not to solicit customers and employees are reasonable as to time, territory, and restricted activity.

53. Frye's solicitation of Millard customers will cause Millard irreparable injury.

54. Frye's solicitation of Millard employees will cause Millard irreparable injury.

55. Millard has made contemporaneous demand on Frye to not solicit Millard's customers or employees and to not assist any Millard competitor in doing so.

56. Millard has no adequate remedy at law if Frye were to breach the Frye contract.

57. Millard is likely to succeed on the merits of his breach of contract claim against Frye.

## COUNT V
## BREACH OF FIDUCIARY DUTY BY DEFENDANT FRYE

58. Plaintiff re-alleges paragraphs 1-57 as paragraph 58 of Count V.

59. During his employment with Millard, Frye had a fiduciary duty to Millard.

60. Frye knew he would be leaving Millard to work at Harvard, and he intentionally underperformed his Millard duties during the final two to three months of his Millard employment, especially in situations where Harvard might gain by his underperformance. In so doing, Frye breached his fiduciary duties to Millard.

61. Millard has been injured by Frye's breach of his fiduciary duties.

62. Frye's breach of his duties was a proximate cause of Millard's injury.

## COUNT VI
## TORTIOUS INTERFERENCE WITH
## THE STUTESMAN CONTRACT BY DEFENDANT HARVARD

63. Plaintiff re-alleges paragraphs 1-62 as paragraph 63 of Count VI.

64. The Stutesman contract is a valid and enforceable contract between Millard and Stutesman.

65. Defendant Harvard is aware of the Stutesman contract.

66. Defendant Harvard has intentionally and unjustifiably induced Stutesman to breach the Stutesman contract.

67. Harvard's conduct has caused Stutesman to breach his contract.

68. Millard has been damaged by Harvard's interference with the Stutesman contract.

69. Harvard's solicitation of Millard customers with Stutesman's improper assistance will cause Millard irreparable injury.

70. Millard has made contemporaneous demand on Harvard to return to Millard any information that Stutesman has converted and shared with Harvard.

71. Millard has made contemporaneous demand on Harvard to sever its improper relationship with Stutesman.

72. Millard has no adequate remedy at law against Harvard if Stutesman were to breach the Stutesman contract for Harvard's benefit.

73. Millard is likely to succeed on the merits of his tortious interference claim against Harvard.

## COUNT VII
## TORTIOUS INTERFERENCE WITH
## THE FRYE CONTRACT BY DEFENDANT HARVARD

74. Plaintiff re-alleges paragraphs 1-73 as paragraph 74 of Count VII.

75. The Frye contract is a valid and enforceable contract between Millard and Frye.

76. Defendant Harvard is aware of the Frye contract.

77. Defendant Harvard has intentionally and unjustifiably induced Frye to breach the Frye contract.

78. Harvard's conduct has caused Frye to breach his contract.

79. Millard has been damaged by Harvard's interference with the Frye contract.

80. Harvard's solicitation of Millard customers with Frye's improper assistance will cause Millard irreparable injury.

81. Millard has made contemporaneous demand on Harvard to return to Millard any information that Frye has converted from Millard and shared with Harvard or received from Stutesman and shared with Harvard.

82. Millard has made contemporaneous demand on Harvard to sever its improper relationship with Frye.

83. Millard has no adequate remedy at law against Harvard if Frye were to breach the Frye contract for Harvard's benefit.

84. Millard is likely to succeed on the merits of its tortious interference claim against Harvard.

## **RELIEF REQUESTED**

Plaintiff Millard respectfully requests this Court to enter the following relief:

A. An affirmative injunction requiring Stutesman to return all Stolen Material to Millard;

B. An affirmative injunction requiring Harvard and/or Frye to return all of the Stolen Material that Stutesman has shared with them;

C. An injunction prohibiting Stutesman from using, accessing (other than to return or produce in discovery), or directly or indirectly disclosing any confidential, proprietary, or trade secret information, including the May 26 Stolen Information, to Harvard (or any other Millard competitor);

D. An injunction prohibiting Stutesman from directly or indirectly soliciting any Millard customer to remove its business from Millard and from assisting Harvard (or any other Millard competitor) to do so, until at least July 26, 2019;

E. An injunction prohibiting Stutesman from soliciting any Millard employee for employment outside of Millard and from assisting Harvard (or any other Millard competitor) to do so, until at least July 26, 2019;

F. An affirmative injunction requiring Frye to return all Millard Confidential Information or Trade Secrets in his possession, custody, or control;

G. An affirmative injunction requiring Harvard to return all Millard Confidential Information or Trade Secrets in its possession, custody, or control that it has obtained from Frye;

H. An injunction prohibiting Defendant Frye from using, accessing (other than to return or produce in discovery), or directly or indirectly disclosing any

15

confidential, proprietary, or trade secret information, including the May 26 Stolen Information, to Harvard (or any other Millard competitor);

I. An injunction prohibiting Frye from disclosing any Millard Confidential Information or Trade Secrets to Harvard (or any other Millard competitor);

J. An injunction prohibiting Frye from soliciting any Millard customer to remove its business from Millard and prohibiting him from assisting Harvard (or any other Millard competitor) in doing so, until at least November 20, 2019;

K. An injunction prohibiting Frye from soliciting any Millard employee for employment outsider of Millard and prohibiting him from assisting Harvard (or any other Millard competitor) in doing so, until at least November 20, 2019;

L. An Order extending the time of the injunctions beyond November 20, 2019, for each month in which Frye is in violation of the binding Frye contract;

M. For purposes of a temporary restraining order only, prohibiting Defendant Stutesman from beginning or continuing employment with Harvard until further order of the Court (and most specifically, until the status of the May 26 Stolen Information and any other confidential or trade secret information has been resolved);

N. For purposes of a temporary restraining order only, prohibiting Defendant Frye from beginning employment with Harvard until further order of the Court (and most specifically, until the status of the May 26 Stolen Information and any other confidential or trade secret information has been resolved);

O. An Order requiring Frye to reimburse Millard for all attorney's fees, costs, and expenses that Millard reasonably incurred in connection with enforcing its rights and remedies under the Frye contract;

P. Compensatory damages against Defendants in amounts to be determined by the Court.

Q. Punitive damages against Defendant Stutesman for his conversion of the May 26 Stolen Information.

R. Punitive damages against Defendant Frye for breaching his fiduciary duties to Millard.

S. All compensable costs under 18 U.S.C. § 1920;

T. Post-judgment interest; and

U. Any other relief that the Court deems just and proper under the circumstances.

Dated: November 26, 2017

>*/s/ Stuart J. Chanen*
>Stuart J. Chanen
>Valorem Law Group
>218 N. Jefferson Street, Suite 300
>Chicago, IL  60661
>(312) 676-5480
>Stuart.Chanen@valoremlaw.com
>
>*Counsel for Plaintiff The Millard Group Inc.* and
>*Plaintiff Millard Metal Maintenance Co. LLC*