IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE MILLARD GROUP INC., and | ) | |
| MILLARD METAL MAINTENANCE CO. LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 17 CV 8520 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| BRADLEY J. STUTESMAN, | ) | |
| TOM FRYE, and | ) | |
| HARVARD MAINTENANCE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Bradley Stutesman and Tom Frye worked for The Millard Group Inc. and Millard Metal Maintenance Co. LLC (collectively, "Millard"), an enterprise that provides janitorial services. Stutesman was a Senior Vice President; Frye, a sales representative. While they were with Millard, they emailed confidential Millard files to their personal email accounts. Stutesman left. Frye joined a competitor, Harvard Maintenance, Inc. Millard sued all three of them: Stutesman, Frye, and Harvard Maintenance.

Although the claims in Millard's first amended complaint are many, they center on three allegations: (1) Stutesman and Frye, by failing to encrypt Millard's confidential files, violated Millard's encryption policy; (2) Stutesman and Frye planned to misuse Millard's confidential files against Millard; and (3) Harvard Maintenance turned Stutesman and Frye against Millard. Millard argues that these three allegations sustain claims under the Computer Fraud and Abuse

Act, 18 U.S.C. § 1030(a)(2)(C), and claims for breach of contract, conversion, breach of fiduciary duty, and tortious interference with contract.

There is no genuine dispute that Stutesman and Frye failed to encrypt Millard's confidential files when they emailed the files to their personal email accounts. There is also, however, no genuine dispute that neither of them knew about Millard's encryption policy, that other Millard employees also knew nothing about the policy, that other Millard employees also emailed themselves confidential Millard files without encryption, and that the policy had never been enforced against any Millard employee. Millard's other two accusations—that Stutesman and Frye were disloyal to Millard and that Harvard Maintenance induced their disloyalty—are unsupported by any admissible evidence.

Stutesman, Frye, and Harvard Maintenance are thus entitled to summary judgment on all claims save one: Millard's breach of contract claim against Stutesman. On that claim, Millard is entitled to partial summary judgment on liability. Stutesman's non-compete agreement barred him from retaining information about Millard's customers and business practices after termination, and there is no dispute that Stutesman retained such information in his personal email account.

## DISCUSSION

In its first amended complaint, Millard brings the following claims against Stutesman, Frye, and Harvard Maintenance:

| | |
|---|---|
| **Bradley Stutesman** | Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) (Count I) |
| | common law conversion (Count III) |
| | breach of contract (Count V) |
| **Tom Frye** | Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) (Count II) |
| | common law conversion (Count IV) |
| | breach of contract (Count VI) |
| | breach of fiduciary duty (Count VII) |
| **Harvard Maintenance** | tortious interference with Stutesman contract (Count VIII) |
| | tortious interference with Frye contract (Count IX) |

Millard moves for partial summary judgment against Stutesman and Frye, seeking to hold them liable for violating the Computer Fraud and Abuse Act and for breaching their contracts. Stutesman, Frye, and Harvard Maintenance move for summary judgment on all claims. Summary judgment is proper when a reasonable jury considering the evidence could return a verdict only for the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250–51 (1986). The court draws all justifiable inferences in favor of the non-moving party. Id. at 255. The facts are taken from the parties' L.R. 56.1 statements and from the depositions and exhibits, and are not genuinely disputed unless otherwise noted.

The court holds that: (1) Stutesman is entitled to summary judgment on all claims except for the breach of contract claim, on which Millard is entitled to partial summary judgment on liability; (2) Frye is entitled to summary judgment on all claims; and (3) Harvard Maintenance is entitled to summary judgment on all claims.

## 1    Stutesman

When Stutesman joined Millard as a general manager in 1998, he signed a non-compete agreement in which he agreed that after he left, he would not disclose Millard's confidential information, solicit Millard's employees, or retain information about Millard's customers and business practices. Nineteen years later, in July 2017, he left the company as Senior Vice President of Operations.

From January through June 2017, Stutesman sent ten emails from his Millard email account to his personal email account. Some of those emails attached copies of confidential Millard files—files containing Millard's profit margins, customer lists, and employee salaries. Stutesman did not encrypt the files before emailing them. Although he was allowed to access confidential files as Millard's Senior Vice President of Operations, emailing such files without encryption arguably violated Millard's Electronic Communications Policy: "Due diligence should be exercised when exchanging files or data via the Internet. Employees should not transfer sensitive or confidential files without approved encryption or other security precautions." Stutesman did not know about this policy until Millard sued him.

Millard finds particularly suspicious an email that Stutesman sent on Friday, May 26, 2017. That evening, he emailed himself a .ZIP file containing confidential Millard files. Stutesman testified that he wanted to work on those files over the Memorial Day Weekend. Millard had lost a significant customer earlier that day—according to Stutesman, the loss of that customer required him to update and revise information related to a commercial reorganization and restructuring project. Stutesman, however, could not open the .ZIP file on his home computer. He never opened the files inside, never printed them, and never sent or shared them with anyone.

Stutesman left the company at the end of July 2017. To protect his privacy, he deleted many emails from his Millard email account, including every email that he had sent to his personal email account. (He did not delete emails that were sent to or received from Millard clients or co-workers.) Stutesman testified that he deleted those emails because they had nothing to do with Millard and they contained personal information. They included, for example, emails from his lawyers about his uncle's will and emails from his doctors about his wife's illness. He did not, however, delete Millard's confidential files from his own email account. There is no evidence that Stutesman ever offered those files to a Millard competitor, no evidence that he exploited them to solicit Millard's customers or employees, and no evidence that he used them against Millard in any way.

In November 2017, three months after he left Millard, Stutesman met with John Rowley, Senior Vice President at Harvard Maintenance, a Millard competitor. Stutesman and Rowley discussed not only personal topics (they were friends and had known each other for 17 years), but also the possibility that Harvard Maintenance might hire Stutesman to handle a client account—a client with no prior relationship with Millard. Stutesman also told Rowley that two Millard employees, Barb Uchacz and Randy Carollo, were overworked and would be "worth talking to" if the employees "reached out." Harvard Maintainence never did hire Stutesman. Uchacz or Carollo both still work at Millard. Neither Harvard Maintenance nor Stutesman ever got in touch with them—at least, there is no admissible evidence of that. Millard offers a screenshot of a text message allegedly between Stutesman and Uchacz, but that screenshot is obviously inadmissible because it is unsworn and unauthenticated. And other than a reference to "Barb," the screenshot even lacks Stutesman and Uchacz's names.

After this suit was filed, Millard and Stutesman (and Frye) agreed to hire an impartial firm to examine Stutesman's home computer. Their chosen firm, DC Data Corporation, collected and processed data on Stutesman's computer and iCloud account. Millard paid the bill.

Millard claims that Stutesman: violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally exceeding his authorized access to obtain information from Millard's computers; committed common law conversion by wrongfully assuming control over Millard's files; and breached his non-compete agreement by retaining Millard's files after he left the company. As noted, the court holds that: (1) Stutesman is entitled to summary judgment on Millard's Computer Fraud and Abuse Act claim; (2) Stutesman is entitled to summary judgment on Millard's common law conversion claim; and (3) Millard is entitled to partial summary judgment on liability on Millard's breach of contract claim.

## 1.1 Computer Fraud and Abuse Act

The Computer Fraud and Abuse Act makes it a criminal and civil offense for a person to obtain information from a computer by intentionally exceeding authorized access. 18 U.S.C. § 1030(a)(2)(c); 18 U.S.C. § 1030(g). To exceed authorized access is to "access a computer with authorization and to use such access to obtain . . . information in the computer that the accesser is not entitled so to obtain . . . ." 18 U.S.C. § 1030(e)(6).

Stutesman emailed confidential Millard files from his Millard email account to his personal email account. By doing so, Millard argues, Stutesman intentionally exceeded his authorized access in two ways: (1) Stutesman failed to encrypt the files, thus violating the company's Electronic Communications Policy; and (2) Stutesman intended to misuse the confidential files, perhaps by offering them to a Millard competitor. Because no reasonable jury

could find for Millard on either theory, Stutesman is entitled to summary judgment on Millard's Computer Fraud and Abuse Act claim.

**Violation of Millard's Electronic Communications Policy.** No reasonable jury could find that Stutesman violated Millard's Electronic Communications Policy intentionally. Millard admits that Stutesman did not know about it. In fact, before suing Stutesman, Millard had never enforced the policy and had never disciplined any employee for violating it. Multiple other Millard employees, including a sales representative and two regional sales managers, testified that they, too, knew nothing about the policy and that they, too, had emailed themselves confidential files without encryption. Millard told them to stop doing so; Millard did not sue them in federal court. Stutesman could not have intentionally violated a policy that he and other Millard employees knew nothing about, a policy that Millard had never before enforced—a policy with language both precatory ("Employees <u>should not</u> transfer sensitive or confidential files") and vague ("without approved encryption or <u>other security precautions</u>") (emphasis added).

Millard does no better even if Stutesman violated the Electronic Communications Policy intentionally. Stutesman exceeded authorized access if, by abusing his access to his Millard computer, he obtained information that he was "not entitled so to obtain." 18 U.S.C. § 1030(e)(6). There is no dispute, however, that Stutesman was entitled to obtain the information in Millard's files—he was the company's Senior Vice President of Operations. He was authorized to use his Millard computer to access Millard information. Whatever Stutesman may have done next with that information did not curtail his authority to access it in the first place. As Millard concedes, quoting <u>CouponCabin LLC v. Savings.com, Inc.</u>, No. 2:14-CV-39-TLS, Doc. 136, at 3, 2017 WL 83337, at *2 (N.D. Ind. Jan. 10, 2017), "Liability under § 1030(a)(2) is

triggered by the unauthorized <u>access</u> of electronic data—not by the unauthorized <u>use</u> of such data." (emphasis in original). Emailing confidential Millard files without encryption was (at worst) an unauthorized use of Millard information. Stutesman was nonetheless authorized to access it.

      **Intent to misuse Millard's confidential files.** Millard's other theory is that Stutesman accessed his Millard computer to obtain and misuse confidential files, perhaps by offering them to a Millard competitor. Because this theory turns on Stutesman's alleged disloyalty, Millard's claim is not that Stutesman exceeded his authorized access to his Millard computer, but that he had no authority at all. 18 U.S.C. § 1030(a)(2). If Stutesman accessed his Millard computer with a disloyal mind, having acquired interests adverse to Millard, he was no longer Millard's agent and thus lacked authority to access his Millard computer. <u>International Airport Centers, L.L.C. v. Citrin</u>, 440 F.3d 418, 420–21 (7th Cir. 2006).

      No reasonable jury could find that Stutesman's interests were adverse to Millard at the time he emailed Millard's files to his personal email account. Millard offers no evidence to dispute Stutesman's testimony that he wanted to work on the files over the Memorial Day Weekend. Nor does Millard offer any evidence to dispute Stutesman's testimony that he ended up not working on those files because he could not open the .ZIP file on his home computer. Millard is left with Stutesman's failure to encrypt—and that failure raises no inference of suspicion because, as Millard admits, Stutesman knew nothing about Millard's encryption policy. As for Stutesman deleting the emails that he had sent to his personal email account, Millard offers no admissible evidence, direct or circumstantial, to genuinely dispute Stutesman's reasons

for doing so: the emails either contained his personal information or were otherwise irrelevant to Millard.[*]

Because no reasonable jury could find that Stutesman intentionally exceeded his authorized access to Millard's computers or that he accessed Millard's computers without authorization, the court need not decide whether he caused Millard at least $5,000 in losses, as required to maintain a civil action under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

### 1.2 Conversion

Millard also sues Stutesman for conversion: the "wrongful deprivation of property from the person entitled to possession permanently or for an indefinite time." In re Rosin, 156 Ill. 2d 202, 208 (Ill. 1993). Stutesman is entitled to summary judgment on Millard's conversion claim. Emailing himself confidential Millard files might violate company policy, if he did so without encryption, or violate trade secrets laws, if he planned to use the files against Millard. Conversion, however, requires a deprivation. Millard admits Stutesman did not alter, delete, or destroy any Millard file. The files that he emailed himself were mere copies of files that existed on Millard's servers—files that remained intact and accessible to Millard. Millard was deprived of nothing, not even for a moment, much less permanently or for an indefinite time.

Millard's conversion claim is also preempted by the Illinois Trade Secrets Act, 765 ILCS 1065, because the claim is essentially that Stutesman misappropriated trade secrets. See Spitz v. Proven Winners North America, LLC, 759 F.3d 724, 733 (7th Cir. 2014). Millard's request to replace its conversion claim with an Illinois Trade Secrets Act claim, 765 ILCS 1065/3(a), is denied. There is no evidence from which a jury could reasonably find that Stutesman used,

---

[*] Millard disclaims any intention to base any of its claims on Stutesman's personal emails.

threatened to use, or inevitably would use against Millard the confidential files he had emailed himself. Without such evidence, a Trade Secrets Act claim would be dead on arrival.

### 1.3  Breach of Contract

Millard's last claim against Stutesman is for breach of contract. Stutesman's non-compete agreement with Millard bars him from: (1) disclosing Millard's confidential information; (2) soliciting or attempting to solicit Millard's employees; or (3) retaining information about Millard's customers and business practices. No reasonable jury could find that Stutesman breached either the non-disclosure or the non-solicitation provision. Millard is nonetheless entitled to partial summary judgment on its breach of contract claim (as to liability) because the undisputed facts show that Stutesman breached the retention-of-information provision.

**Disclosure of Millard's confidential information.** No reasonable jury could find that Stutesman disclosed Millard's confidential information. Stutesman agreed not to disclose to "any confidential or proprietary information, including, without limitation, business and financial information, the identity of the customers, suppliers and accounts of the Employer, . . . and the types of services provided and prices charged by the Employer . . . ." Under this definition, the "happiness levels" (as Millard puts it) of Barb Uchacz and Randy Carollo plainly do not qualify as confidential or proprietary. The Millard files that Stutesman emailed himself surely count, but there is no evidence that he ever gave them to Harvard Maintenance or to anyone else.

**Solicitation of Millard employees.** Nor could a reasonable jury find that Stutesman tried to solicit Millard's employees. Stutesman agreed not to "directly or indirectly[] solicit, divert, take away or attempt to solicit, divert or take away" any Millard employee, or "assist any other person, firm, or corporation" in doing so. "'Solicitation' connotes taking some affirmative

measures." Quality Transportation Services, Inc. v. Mark Thompson Trucking, Inc., 2017 IL App (3d) 160761, ¶ 26 (Ill. App. 2017).

No reasonable jury could find that Stutesman affirmatively tried to take Uchacz and Carollo away from Millard. There is no evidence that Stutesman even talked to them. Nor could a reasonable jury find that Stutesman helped Harvard Maintenance do what he could not himself do—he merely told Rowley that Uchacz and Carollo were overworked and would be "worth talking to" if Uchacz and Carollo "reached out." Stutesman spoke plainly: Uchacz and Carollo are good employees, and if they apply, you should interview them. There is no evidence that he meant anything else. There is no evidence that Rowley understood anything else.

Nothing in the non-solicitation provision bars Stutesman from opining on the quality of Millard's employees. And there is no evidence that doing so led to Rowley approaching Uchacz and Carollo—no admissible evidence, at least, and Millard's unsworn and unauthenticated screenshot of a text message between two unidentified people is plainly inadmissible. Even if the screenshot were admissible, the non-solicitation provision would be an unenforceable, unreasonable restraint of trade, as applied to Stutesman, if it stopped him from sharing non-confidential employee information with no solicitous intent. See YCA, LLC v. Berry, No. 03 C 3116, 2004 WL 1093385 (N.D. Ill. May 7, 2004); see generally AssuredPartners, Inc. v. Schmitt, 2015 IL App (1st) 141863, ¶ 32 (Ill. App. 2015).

**Retention of Millard's confidential information.** Millard is nonetheless entitled to partial summary judgment because the undisputed facts show that Stutesman breached the retention-of-information provision. Stutesman concedes that he retained Millard's confidential information in his personal email account after he left the company. He argues only that Millard suffered no damages. Millard, however, is entitled to the benefit of the bargain: had Stutesman

complied with the retention provision, Millard would not have hired DC Data Corporation to examine Stutesman's computer. Because at least some portion of the fees that Millard paid were expenses reasonably incurred to mitigate Stutesman's breach, see Toledo Peoria & Western Railway v. Metro Waste Systems, Inc., 59 F.3d 637, 640 (7th Cir. 1995), there is no genuine dispute that Stutesman is liable. There is, however, a genuine dispute as to the amount of Millard's damages, which Millard and Stutesman should be prepared to discuss at the upcoming status hearing.

## 2 Frye

Millard also sued Frye, another former employee. When Frye joined Millard as a sales representative in 2015, he signed a confidentiality and non-solicitation agreement in which he promised to return Millard's confidential information upon the request of an authorized Millard employee or, in any event, within five business days after termination of his employment. While Frye was at Millard, he—like Stutesman and other Millard employees—emailed confidential Millard files from his Millard email account to his personal email account so that he could work on them at home. And like Stutesman, Frye emailed those files without encryption.

In April 2017, Frye began negotiating a new job with defendant Harvard Maintenance, a Millard competitor. His last day employed by Millard was November 30. The next day, he started working for Harvard Maintenance as a branch manager.

From April through November, Frye and Harvard Maintenance emailed each other to negotiate the terms of Frye's new job. During those months, Frye emailed himself confidential Millard files without encryption. Millard argues that when Frye emailed himself those files, his loyalties had shifted to Harvard Maintenance—his future employer. As with Stutesman, there is no evidence that Frye knew about Millard's encryption policy, no evidence that Frye ever offered

Millard's files to Harvard Maintenance or to any other Millard competitor, no evidence that Frye exploited the files to solicit Millard's customers or employees, and no evidence that Frye used the files against Millard in any way.

Frye signed an employment agreement with Harvard Maintenance on November 14. Three days later, on November 17, he told his Millard supervisor, David Schupmann, that he was leaving Millard. Schupmann testified that:

> I just remember encouraging him that this could be, you know, a touchy situation. I just really wanted the best for him. And I wanted to make sure he did it as clean as possible. I remember saying that a few times, "just make sure you're as clean as you can be in doing this."

Frye's last day physically in Millard's office was three days later, on November 20. Schupmann again told Frye to stay "clean." When Frye's lawyer asked Schupmann, "Did you indicate to him that any Millard materials that he had in his possession should be returned to the company?," Schupmann testified, "I don't recall if I specifically used those words."

Millard sued Frye seven days later, claiming that: (1) Frye violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), by intentionally exceeding his authorized access to obtain information from Millard's computers; (2) Frye converted Millard's confidential files; (3) Frye breached his confidentiality and non-solicitation agreement by retaining Millard's documents after he left; and (4) Frye breached his fiduciary duty to Millard by performing poorly in his last two months. Frye is entitled to summary judgment on all four claims.

## 2.1 Computer Fraud and Abuse Act

Millard argues that Frye intentionally exceeded his authorized access to obtain information that he was not entitled to obtain, § 1030(a)(2)(c), by emailing confidential Millard files from his Millard email account to his personal email account. First, Millard argues that

emailing confidential files without encryption violated the company's Electronic Communications Policy. Second, Millard argues that when Frye emailed the files to himself, his loyalty had shifted to Harvard Maintenance, so he had no authority to access his Millard computer and the confidential files inside.

Because the encryption theory is legally defective, and because no reasonable jury could find for Millard based on the disloyalty theory, Frye is entitled to summary judgment on Millard's Computer Fraud and Abuse Act claim. Millard's encryption theory fails for the same reasons as Stutesman: whether Frye complied with Millard's vague, advisory, and unenforced encryption policy is irrelevant. What matters is whether Frye was entitled to obtain the information that he obtained. There is no dispute that he was.

Millard's disloyalty theory fares no better. According to Millard, a jury could infer Frye's disloyalty from three sets of facts: (1) Frye emailed himself confidential files without encryption; (2) Frye, at that time, was negotiating a new job with Harvard Maintenance; and (3) Frye did not delete the files in his personal email account after Schupmann told him to "make sure you're as clean as you can be in doing this [leaving Millard]." No reasonable jury, however, could infer that Frye's interests were adverse to Millard when he emailed Millard's files to himself. None of Millard's three sets of facts independently raises an inference of suspicion. Nor do they in combination, for "zero plus zero is zero." Gorence v. Eagle Food Centers, Inc., 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence . . . .").

**Emailing confidential Millard files without encryption.** First, as discussed, non-compliance with the encryption policy was apparently common at Millard, so a particular employee's non-compliance raises no suspicion. That is especially so given Millard's theory of

Frye's disloyalty: if Frye really intended to steal Millard's files, he had nothing to gain by not encrypting them. Had he done so, he still could have downloaded the encrypted Millard files from his personal email account and still could have given them to Harvard Maintenance.

**Emailing confidential Millard files while negotiating with Harvard Maintenance.** Second, none of Millard's evidence, nothing in Frye's confidentiality and non-solicitation agreement, and no commonsense understanding of employer-employee relations suggests that seeking a job with Harvard Maintenance made Frye disloyal to Millard—he was free to do so. If Frye planned to give to Harvard Maintenance the Millard files in his inbox, Millard offers no evidence of that.

**Failing to delete confidential Millard files from personal email account.** Third, Schupmann said nothing about returning confidential Millard files. He told Frye to stay "clean." Frye's mere inaction in response to such vague advice could not allow a jury to infer that he had developed interests adverse to Millard. And even if Frye somehow should reasonably have construed Schupmann's words as a command, any inference of disloyalty would be minimal because Frye had such little time to comply: Millard sued him just one week after his last day in the office. He had yet to begin working for Harvard Maintenance—and had not even collected his last Millard paycheck.

Because no reasonable jury could find that Frye intentionally exceeded his authorized access to Millard's computers or that he accessed Millard's computers without authorization, the court need not decide whether he caused Millard at least $5,000 in losses, as required to maintain a civil action under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

### 2.2 Conversion

Millard also brings a claim against Frye for converting Millard's confidential files. Frye is entitled to summary judgment on Millard's conversion claim for the same reasons as Stutesman. Millard suffered no deprivation, and the claim is preempted by the Illinois Trade Secrets Act, 765 ILCS 1065, because a claim for conversion is essentially a claim that Frye misappropriated trade secrets. Millard's request to replace its conversion claim with an Illinois Trade Secrets Act claim is denied: there is no evidence from which a jury could reasonably find that Frye used, threatened to use, or inevitably would use against Millard the confidential files that he had emailed himself.

### 2.3 Breach of Contract

Millard next claims that Frye breached his confidentiality and non-solicitation agreement with Millard. Frye's agreement has a return-of-confidential-information provision. Under that provision, Frye had to return any copies of Millard's confidential information in his possession "upon the request of an authorized employee or agent of Millard, or in any event within five (5) business days after termination of my employment . . . ." Millard argues that under either condition, Frye breached the return-of-confidential-information provision: he ignored Schupmann's requests to return Millard's files and he failed to return the files five business days after he left the company. No reasonable jury could find for Millard on either theory. Frye is entitled to summary judgment on Millard's breach of contract claim.

**Failure to return Millard's files "upon request."** First, Schupmann did not "request" that Frye return Millard's confidential files. He merely told Frye to stay "clean." Frye could not reasonably have been expected to construe Schupmann's advice to stay "clean" as a request to return Millard's confidential files immediately. Even Schupmann testified that, by telling Frye to

stay clean, he meant, "Just to keep his nose clean, don't solicit customers, don't -- you know, abide by his noncompete. I don't recall that I actually said it, but I inferred protection of information." Had Schupmann said all that to Frye—which he did not—that still would have been only a warning to Frye that he must not solicit Millard's customers and that he must protect Millard's confidential information. It was not a "request" that Frye immediately return Millard's confidential files—and no reasonable jury could so find.

**Failure to return Millard's files five business days after termination.** Second, the undisputed facts show that Frye did not fail to return Millard's files "within five[] business days after termination of [his] employment." In Millard's L.R. 56.1 statement of facts, Millard states that "Frye's last day at Millard was Monday, November 20, 2017." That was Frye's last day physically in the office. There is no evidence that his last day in the office was also his termination date: Frye, Schupmann, and Gina Fritz, Millard's Director of Human Resources, each testified that Frye's termination date was November 30. That date is corroborated by (1) Frye's Employee Change of Status Form, signed by Schupmann, and (2) Frye's post-termination healthcare benefits letter, sent by Millard's healthcare administrator. Both documents state that Frye's termination date was November 30.

Even accepting Millard's baseless assertion that Frye's last day was November 20, Frye still had five business days to delete Millard's confidential files—until November 27, 2017. That was the day Millard sued him. Millard admits that once Frye received notice of Millard's suit, he could not delete the Millard files in his personal email account. See Fed. R. Civ. P. 37(e). By suing Frye, Millard prevented him from deleting Millard's files within five business days after termination. Millard cannot hold Frye liable for failing to fulfill a condition that Millard prevented him from fulfilling.

Because no reasonable jury could find that Frye breached his confidentiality and non-solicitation agreement with Millard, the court need not decide whether the return-of-confidential-information provision is an unenforceable restraint of trade or whether the alleged breach caused any damages.

### 2.4  Breach of Fiduciary Duty

Finally, Millard claims that Frye breached his fiduciary duty by performing poorly in his last two months. As Millard's employee, Frye owed Millard a duty of loyalty. <u>Lawlor v. North American Corp. of Illinois</u>, 2012 IL 112530, ¶ 69 (Ill. 2012). He thus could neither "act inconsistently with his agency or trust," nor "solicit his employer's customers for himself." <u>Id.</u> Frye is entitled to summary judgment on Millard's breach of fiduciary duty claim: Millard offers no evidence that Frye either performed poorly during his last two months, no evidence that Frye solicited Millard's customers, and no evidence that Frye was otherwise disloyal to Millard in any way while he was employed by Millard.

### 3  Harvard Maintenance

The third and last defendant is Millard's competitor—Harvard Maintenance. Millard claims that Harvard Maintenance tortiously interfered with Millard's non-compete agreement with Stutesman and Millard's confidentiality and non-solicitation agreement with Frye. Among other things, a tortious interference claim requires that: (1) Harvard Maintenance intentionally and unjustifiably induced Stutesman or Frye to breach their Millard contracts; and (2) Harvard Maintenance caused Stutesman or Frye to breach their Millard contracts. <u>HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.</u>, Ill.2d 145, 154–55 (Ill. 1989).

Because Millard offers no evidence that Harvard Maintenance induced or caused Stutesman or Frye to breach their agreements with Millard, Harvard Maintenance is entitled to summary judgment on both of Millard's tortious interference claims.

### 3.1 Tortious Interference with Stutesman Contract

Millard's theory that Harvard Maintenance tortiously interfered with Stutesman's contract is not that Harvard Maintenance induced Stutesman to retain Millard's files, but instead that Harvard Maintenance induced Stutesman to solicit two Millard employees, Barb Uchacz and Randy Carollo. The theory is without any evidence. There is no evidence that Stutesman encouraged Uchacz or Carollo to leave Millard, no evidence that Stutesman assisted Harvard Maintenance in doing so, no evidence that Harvard Maintenance attempted to do so, and no evidence that Harvard Maintenance in fact did so.

### 3.2 Tortious Interference with Frye Contract

Nor does Millard offers any evidence that Harvard Maintenance tortiously interfered with Millard's agreement with Frye. Millard stridently carries on for pages about Frye allegedly taking a sales role at Harvard Maintenance, but all that is beside the point: nothing in Frye's confidentiality and non-solicitation agreement with Millard bars him from joining a competitor in a sales role or from earning commissions based on revenue growth. There is no evidence that Frye breached his agreement with Millard, either by failing to return Millard's confidential information or by disclosing Millard's information to Harvard Maintenance, and no evidence that Harvard Maintenance encouraged Frye to do so.

Millard's sales commissions argument is not just irrelevant. It is misleading. In its L.R. 56.1 statement of facts, Millard states that Harvard Maintenance's "John Rowley circulated an internal memo on October 10, 2017, which was also shared with Frye. The memo stated that

'Tom felt as though the structure of the bonus plan contradicted the language' regarding not being in a business development position.'" Millard goes on to say, "Rowley further stated in Exhibit 17 that 'we will need to somehow reword the bonus language.'" The inference a reasonable jury could draw, Millard argues, is that Frye and Rowley were colluding to conceal Frye's bonus incentives.

Millard misleadingly ends Rowley's statement with a period, rather than an ellipsis. The full quotation dispels any possible inference of a conspiracy to conceal Frye's bonus incentives:

| Harvard Maintenance memo to Frye | Millard's statement of additional facts |
| --- | --- |
| We don't want to put you or Harvard in a situation that violates any points of your agreement with your current employer. <u>We will need to somehow reword the bonus language to clearly state that the branch revenue growth is part of being the branch leader but you are not in a sales role</u>. We would expect you to be a part of any new sales or renewal process in your functional area. That said, you would be explicitly asked to not participate in any new business opportunities that would violate your contract. | John Rowley circulated an internal memo on October 10, 2017, which was also shared with Frye. The memo stated that "Tom felt as though the structure of the bonus plan contradicted the language" regarding not being in a business development position." Rowley further stated in Exhibit 17 that "<u>we will need to somehow reword the bonus language.</u>" |

(emphasis added). As Frye and Harvard Maintenance rightly argue, "Whether intentional or accidental, Millard's use of a period to inaccurately signal the end of a sentence, and concomitant omission of the emphasized portion of the sentence, lends neither credence nor credibility to Millard's pleadings and arguments."

## CONCLUSION

Plaintiff The Millard Group Inc.'s motion for partial summary judgment against defendants James Stutesman and Tom Frye (Doc. 59) is granted for Count V (breach of contract by Stutesman) on liability, and is otherwise denied. Stutesman's motion for summary judgment (Doc. 90) is denied for Millard's breach of contract claim, and is otherwise granted. Frye's motion for summary judgment (Doc. 64) is granted. Defendant Harvard Maintenance Inc.'s motion for summary judgment (Doc. 65) is granted. Millard's motion to compel a second deposition of Frye (Doc. 125) is denied as moot.

This matter is set for a report on status on July 16, 2019, at 9:15 a.m., for Millard and Stutesman to discuss the damages issue with respect to Stutesman's breach of contract.

**ENTER:**     **July 10, 2019**

**Robert W. Gettleman**
**United States District Judge**